CITY OF GREENWOOD, Missouri,
Respondent,

v.

MARTIN MARIETTA MATERIALS,
INC., et al., Appellants.

Nos. WD 69690, WD 69787.

Missouri Court of Appeals,
Western District.

Aug. 11, 2009.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 22, 2009.

Application for Transfer Denied
Jan. 26, 2010.

608

Edward Robertson, Jr., Kansas City, MO, for Appellant, Martin Materials.

Brian J. Madden, Kansas City, MO, for Appellant, Hunt Materials.

Steven E. Mauer, Heather S. Esau Zerger, Kansas City, Brian C. Walsh, St. Louis, for Respondent.

Before Division Three: HAROLD L. LOWENSTEIN, Presiding Judge, JOSEPH M. ELLIS and LISA WHITE HARDWICK, JJ.

HAROLD L. LOWENSTEIN, Judge.

This suit arises from the use of a city street by trucks transporting rock from a quarry. Trucks carrying crushed rock pass through the city from a quarry located just south of the plaintiff city to a state highway north of the city. The City of Greenwood ("Greenwood") brought suit for public nuisance—the unreasonable interference with a community right—and negligence—for improper repair of damage to a city street—against the quarry owners, Martin Marietta Materials, Inc. ("Martin Marietta") and Hunt Martin Materials LLC ("Hunt Martin"). The jury returned a verdict for Greenwood awarding both compensatory and punitive damages. Martin Marietta and Hunt Martin appeal that judgment and the trial court's judgment that a Greenwood ordinance limiting commercial truck traffic was valid and enforceable under Missouri law. This court affirms the judgment of the trial court in all respects except that portion dealing with the post-judgment interest rate, which was incorrectly calculated.

## I. FACTUAL BACKGROUND

The facts, viewed in a light favorable to the judgment are as follows:

The City of Greenwood ("Greenwood") was the plaintiff in the underlying action and respondent here on appeal. Greenwood is a fourth class city of approximately 4,000 residents located in southern Jackson County. The defendants in the underlying suit, and appellants here, are Martin Marietta Materials, Inc. ("Martin Marietta"), a world-wide operator of quarries, and Hunt Martin Materials, LLC ("Hunt Martin"), a company formed in 1995 by Martin Marietta and Hunt Midwest Mining (collectively "Appellants"). The defendants each own fifty percent of the Greenwood Quarry ("the Quarry"),

producing crushed limestone rock on more than 1,000 acres in northern Cass County.

The Quarry has been in operation for more than fifty years. Two routes are available for trucks transporting crushed rock from the Quarry to state highways. The route in dispute here runs approximately 1.25 miles from the Quarry to State Highway 150, then to Highway 291. Quarry trucks use Second Avenue, Walnut Street, and Fifth or Sixth Avenue (collectively "Second Avenue") to reach Highway 150, the major east-west route.[1]

Second Avenue is a paved country road that borders the eastern edge of Greenwood. At places, the road is no more than twenty feet wide. The road was constructed without shoulders, sidewalks, or curbs. The speed limit along Second Avenue was fifteen miles per hour for trucks and twenty-five miles per hour for other vehicles.

The first half mile of the route, running south from Highway 150, proceeds through a residential area where the route takes a sharp turn. Some homes in this area are sited only thirty feet from the road. The homes generally have direct access to Second Avenue. Adjacent properties in the next quarter mile of the route are residences on larger lots or properties put to agricultural use. The last half mile inside the Greenwood city limits is abutted by commercial and industrial areas or undeveloped properties.

Martin Marietta purchased the Quarry in 1991. Yearly production at the Quarry increased steadily from 1991 to 1996, from approximately 600,000 tons to 885,000 tons. In 1996, Hunt Materials purchased fifty percent interest in the Quarry. Production and the resulting truck traffic increased dramatically with subsequent expansion. In 1997, the Quarry produced more than 1.14 million tons of rock per year. Production peaked in 2001 at 1.65 million tons. In 2005, the Quarry produced 1.42 million tons.

Truck traffic began roughly at 6:30 a.m. and continued until after 5:00 p.m. Unloaded trucks proceeded southbound on Second Avenue to the Quarry. Fully loaded trucks—dump trucks carrying 28 tons or semi-trailer trucks carrying 42 tons—proceeded northbound on Second Avenue from the Quarry to Highway 150. An engineering study, commissioned by Greenwood, indicated that as many as 555 trucks use Second Avenue during the Quarry's peak season—almost a truck a minute. The average road usage, based on production tonnage, ranges from 240 to 350 trucks per day, or one truck about every two minutes.

The volume of truck traffic through city streets created problems for residents and businesses and complaints to the city. Neither residents nor businesses could leave their doors or windows open because of the noise and dust. Residents could not maintain gardens or yards along the route because of the dust. One resident testified that she would sweep more than six inches of dust from the end of her driveway every six months.

The truck traffic also raised safety concerns. Residents could not allow their children to play in their front yards or ride their bikes in the vicinity of Second Avenue because of the trucks. The constant truck traffic rendered the route too dangerous to maintain a bus stop; school children were required to be picked up by the bus at their doors.

---

1. A second route requires trucks to take Highway BB to Highway 58 to access Highway 291. The second route is approximately eight miles longer each way. Martin Marietta characterized the alternate route as narrow, rough, and rutty.

As the road was not wide enough for two big trucks to pass each other comfortably, one truck would pull over to the side of the road to allow the other truck to pass. The truck traffic along Second Avenue caused community members to avoid the route. However, no accidents involving trucks were reported in the five years preceding the filing of this suit.

The volume of loaded trucks using the northbound route caused damage to Second Avenue. As the road periodically began to fail, Martin Marietta undertook patching and asphalt overlays to repair the road. Whether this was done with the complicity of Greenwood or in response to complaints from citizens or complaints from the truck drivers was a matter of contention at trial. However, the evidence established that Martin Marietta did not seek permits or engineering studies before undertaking repairs. Between 1993 and 1999 Martin Marietta took bids and hired contractors to do concrete patching and asphalt overlays. Martin Marietta designated the areas to be repaired, hired the contractors, oversaw and paid for the work. At one point, an employee of Martin Marietta tried concrete instead of asphalt in one area. In 2000 and 2001, concrete in the northbound lanes of Second Avenue was patched.

The repeated patches and overlays resulted in a "big quilt" of seams and patches. The asphalt overlay covered three city manholes. The use of both asphalt and concrete caused heaves and swales that retained water after rainfall. The repeated asphalt overlays created dangerous drop-offs and uneven surfaces that cause vehicles to "bottom out" or scrape against the road surface. Deteriorating concrete revealed rebar in the street. Eventually, the continued heavy usage and piecemeal repairs caused the entire road to fail.

## II. PROCEDURAL POSTURE

In July 2006, Greenwood passed an ordinance that limited the weight of trucks using Greenwood city streets. The ordinance effectively closed Greenwood streets, including Second Avenue, to Quarry truck traffic. Martin Marietta and Hunt Martin brought suit against the city in U.S. district court seeking to invalidate and enjoin enforcement of the ordinance. They asserted that Greenwood's actions were in violation of a 1991 contract between the Quarry owners and the city and interfered with interstate commerce. The federal plaintiffs sought, and were granted, a preliminary injunction to prevent enforcement of the ordinance.

In January 2007, Greenwood passed a second ordinance that prohibited commercial vehicles on all city streets. Greenwood then brought the instant case seeking: (1) a declaration that the ordinance was valid and constitutional under Missouri law; (2) compensatory and punitive damages for negligence for the improper repair of Second Avenue;[2] (3) compensatory and punitive damages for public nuisance for unreasonable use of a public road; and (4) compensatory and punitive damages for trespass. On February 1, 2007, Greenwood passed a third ordinance that prohibited "through" commercial vehicles except on commercial use routes[3] and amended Count I of their petition seeking the declaratory judgment of validity of the February 2007 ordinance.

2. Greenwood asserted that the defendants assumed a duty to repair the road but then did so in a defective and unsafe manner, and were, thereby, negligent in repairing the road.

3. Greenwood did not designate any city street as a commercial use route.

The defendants attempted to remove the action to federal court. The district court remanded the action for lack of federal question jurisdiction.

Four counts of Greenwood's five count petition were tried to a jury. In Count II, Greenwood sought damages for negligence related to the unauthorized and unsafe repairs to Second Avenue. In Counts III and IV, Greenwood asserted that the defendant's excessive use of Second Avenue by heavy trucks constituted nuisance. In Count V, Greenwood contended that Martin Marietta trespassed when it caused contractors to enter onto Second Avenue and make unlawful repairs. Greenwood sought both compensatory and punitive damages.

The jury returned verdicts for Greenwood on the negligence and nuisance claims but found for the defendants on Count V, trespass. The jury awarded total compensatory damages of $1.9 million for negligence and nuisance and punitive damages of $7 million against Martin Marietta and $3 million against Hunt Martin.

A bench trial was held on Greenwood's Count I that sought a declaratory judgment that the ordinance complied with state law. The trial court entered judgment concluding that the city's ordinance "is valid and enforceable pursuant to Missouri law."

## III. ANALYSIS

In eleven points, many with several subparts, appellant Martin Marietta challenges the pleading and submissibility of nuisance, the submissibility of negligence, the pleading and submissibility of punitive damages, and the trial court's judgment on the declaratory judgment. Martin Marietta also claims that Greenwood's tort claims should have been brought as compulsory counterclaims in the federal suit. Appellant Hunt Martin raises three points of error that are, for the most part, duplicative of Martin Marietta's claims. Appellants' points of error are addressed out of the order in which they were raised in their briefs and grouped in order to facilitate analysis and understanding.

### A. Nuisance

### 1. Sufficiency of the pleading

In Point IV, Martin Marietta asserts that the Greenwood petition plead that traffic on Second Avenue created a nuisance. Relying on *Grommet v. St. Louis County*, 680 S.W.2d 246, 251 (Mo.App. 1984), Martin Marietta argues that traffic cannot be the basis for a nuisance claim. Martin Marietta contends, for the first time on appeal and without citation to relevant legal support, the only basis that Greenwood could assert for public nuisance regarding a public street was that the defendants create a physical obstruction. Accordingly, Martin Marietta contends that Greenwood's petition failed to state a claim upon which relief could be granted.

■■■ The failure to raise sufficiency of the petition before the trial court does not constitute waiver. *Atkinson v. Smothers*, 291 S.W.2d 645, 648 (Mo.App.1956). The question of the sufficiency of the petition may be raised at any time, including upon appeal. *Id.* Where, however, the sufficiency of the petition is raised for the first time on appeal, "the pleadings should be construed with reasonable liberality to prevent entrapment, unless it wholly fails to state a cause of action." *Id.* at 648–49. "[A] petition will be found sufficient after verdict if, after allowing reasonable inferences and matters necessarily implied from the facts stated, there is sufficient to advise defendant with reasonable certainty as to the cause of action it is called upon to meet and bar another action for the same

subject-matter." *Barber v. Allright Kansas City, Inc.,* 472 S.W.2d 42, 44 (Mo.App. 1971) (internal quotation omitted). "If the allegations invoke principles of substantive law entitling a plaintiff to relief, the petition should not be dismissed." *Norber v. Marcotte,* 134 S.W.3d 651, 657 (Mo.App. 2004).

█ In Count III of its petition, Greenwood asserted that "Defendants' truck traffic annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community." The petition sets forth, additionally, that "[t]he high volume of truck traffic leaving Defendants premises traveling through the City substantially impairs common community rights including: public health, safety, peace and convenience." At trial, Greenwood based its nuisance claim on the noise and dust generated by the trucks, the unreasonable use of a public street by heavy trucks that resulted in the damage to the street, and the safety issues caused by a failing road.

According Greenwood the benefit of reasonable inferences arising from the facts alleged in the pleading, the petition set forth facts sufficient to apprise the defendants of the cause they were required to defend, specifically public nuisance. Point denied.

## 2. Submissibility

In Points IV through VI, Martin Marietta contends that the trial court erred in failing to grant motions for directed verdict and judgment notwithstanding the verdict because Greenwood failed to make a submissible case for public nuisance. Martin Marietta raises six points challenging the submissibility of Greenwood's nuisance count: three points challenge the theory of nuisance propounded by Greenwood and three points assert that Greenwood failed to provide substantial evidence on elements of their claim. Hunt Martin joins in two points challenging the sufficiency of the evidence to support submissibility.

█ The denial of a motion for judgment notwithstanding the verdict is reviewed to determine whether a submissible case was made. *Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 759 (Mo.App.2008). A submissible case is made where the plaintiff presents substantial evidence for every element of the claim. *Payne v. Cornhusker Motor Lines, Inc.,* 177 S.W.3d 820, 832 (Mo.App.2005). Review of whether substantial evidence exists is de novo. *Id.* "In determining whether a submissible case was made, this court views the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the prevailing party." *Id.* "Granting a judgment notwithstanding the verdict is a drastic action, and an appellate court will not overturn a jury's verdict unless there are no probative facts to support it." *Smith,* 275 S.W.3d at 759.

█ Public nuisance encompasses "any unreasonable interference with a right common to the general public." *Jackson v. City of Blue Springs,* 904 S.W.2d 322, 328–29 (Mo.App.1995) (quoting 58 Am.Jur.2d Nuisances § 33 (1989)). A public nuisance is an offense against the public order and economy of the state and violates the public's right to life, health, and the use of property, while, "at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons." *City of St. Louis v. Varahi, Inc.,* 39 S.W.3d 531, 535 (Mo.App.2001) (internal quotation marks omitted). Whether a particular use is reasonable or unreasonable is an issue for the

jury and "does not depend on exact rules but on the circumstances of each case including the locality and character of the surroundings, the nature and value of the use and the extent of harm involved." *Davis v. J.C. Nichols Co.*, 714 S.W.2d 679, 684–85 (Mo.App.1986).

Martin Marietta raises three challenges to Greenwood's theory of public nuisance. Two of the claims of error are unpreserved for appellate review in that Appellants propound these theories for the first time on appeal. In Point V, Martin Marietta claims that Greenwood's theory of off-premises liability was not supported in the law and, in Point IV, claims that the only way Greenwood could show a nuisance arising from the use of a public street was by demonstrating that the trucks created a physical obstruction of the public roadway. Neither of these theories was presented to the trial court or included in the defendants' motions for directed verdict or judgment notwithstanding the verdict.

"Appellate courts are merely courts of review for trial court errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court." *Robbins v. Robbins*, 328 S.W.2d 552, 555 (Mo.1959) (internal quotation marks omitted). "An appellate court will not, on review, convict a trial court of error on an issue that was not put before it to decide." *Mitalovich v. Toomey*, 217 S.W.3d 338, 341 (Mo.App. 2007). Where, as here, the defendant challenged the submissibility of the nuisance count on a number of bases at trial, the defendant cannot, on appeal, challenge submissibility under a different theory. *In re Marriage of Dooley*, 15 S.W.3d 747, 753 (Mo.App.2000) ("[A]s a general rule, 'a party cannot try his case on one theory in the trial court and, if unsuccessful, rely upon a different theory on appeal.'")

As these claims were not properly preserved for appellate review, they are only reviewable for plain error. *See Gill Const., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 723 (Mo.App.2004). Plain error review is discretionary and rarely granted in civil cases. *Hunsucker v. Fischer*, 221 S.W.3d 433, 435 (Mo.App. 2006). Such review is appropriate only where "the error affected substantial rights and a manifest injustice or miscarriage of justice resulted therefrom." *Ruzicka v. Ryder Student Transp. Servs., Inc.*, 145 S.W.3d 1, 15 (Mo.App.2004). "Plain error does not mean prejudicial error; 'plain error places a much greater burden on [the party asserting it] than an assertion of prejudicial error [does].'" *City of Kansas City v. Jordan*, 174 S.W.3d 25, 46 (Mo.App.2005) (*quoting Davolt v. Highland*, 119 S.W.3d 118, 135–36 (Mo.App. 2003)).

Martin Marietta's claim that nuisance may only arise from the unreasonable use of one's own property is not supported in the law. "Property ownership is not a prerequisite to nuisance liability." *Rosenfeld v. Thoele*, 28 S.W.3d 446, 452 (Mo.App.2000) (*quoting* 58 Am.Jur.2d *Nuisances* § 117 (1989)). Indeed, "one who creates a nuisance *whether on his property or not*, is liable for the damage caused thereby." *Id.* at 451–52 (emphasis added) (internal quotations omitted). Martin Marietta's claim that nuisance arising from the defendant's use of a public roadway will *only* be found upon a determination that the use constituted a physical obstacle in equally unfounded. A showing of nuisance does not require "that there should be an actual physical obstruction to the public use upon the surface of the highway." *Loth v. Columbia Theater Co.*, 197 Mo. 328, 94 S.W. 847, 852 (1906) (*quoting* Elliott on Streets and Roads (2d

Ed.) §§ 647, 648, 695). Indeed, "[a]n unauthorized use of a highway, so extensive or so long continued as to be unreasonable may amount to a nuisance." *Id. (quoting Elliott* at §§ 647, 648).

In that Martin Marietta's first two claims are not supported in the law, they do merit plain error review. Accordingly, this court declines to make such a review. Point denied.

In Point IV, Martin Marietta argues that Greenwood's theory of nuisance was not supported in the law because, as a matter of law, traffic alone cannot constitute a nuisance. This claim was properly preserved for appellate review.

Martin Marietta relies on *Grommet v. St. Louis County,* 680 S.W.2d 246 (Mo. App.1984), in which the eastern district of this court held that "[t]he mere driving of automobiles on the paved portion of the roadway or on the unpaved portion of the roadway easement cannot be considered a nuisance. The public is entitled to the full and free use of all the territory embraced within a public roadway." *Id.* at 252. *Grommet* is inapplicable here. First, *Grommet* dealt with a nuisance suit brought by eight homeowners whose property abutted a street providing access to an elementary school. *Id.* at 249. School employees and delivery trucks created traffic congestion but, the court noted, the plaintiffs did not provide any evidence that the individuals using the road to access the school drove unreasonably while on the public road. *Id.* at 250–52. The lack of evidence of unreasonable use defeated the nuisance claim.

■ Here, the issue for the jury was whether the trucks' use of Second Avenue was reasonable. Greenwood presented evidence that volume of truck traffic on a narrow paved country road was unreason-

able. Greenwood presented additional evidence of dust, noise, fumes, and safety issues for both the residents of the area and the traveling public. From the evidence, the jury could conclude that the Quarry trucks' use of the road was unreasonable.

Greenwood's action did not arise from congested roads, as in *Grommet,* but arose from the effect of large trucks transporting crushed rock at times through a residential area at the rate of one every one to two minutes. *Grommet* does not control here. Point denied.

Both Martin Marietta and Hunt Martin question whether Greenwood made a submissible case on two elements of their claim. In Point VI, Martin Marietta asserts that Greenwood failed to demonstrate that the nuisance affected the whole community.[4] They argue that the nuisance affected, at most, a few residents and businesses and that a nuisance that merely affects an individual or a group of individuals is private, rather than public, nuisance. They conclude that, because Greenwood failed to show that the whole community was affected, the city failed to make a submissible case for public nuisance.

■ In determining whether the Appellants' activities constituted a public nuisance, this court must look to both the location of the alleged nuisance and those who may be affected by the nuisance. *City of Kansas City v. New York–Kansas Bldg. Assoc., L.P.,* 96 S.W.3d 846, 857 (Mo. App.2002). A public nuisance is more likely to be found where:

> the alleged nuisance is located in a public place, a place where the public is likely to congregate, a place where the public has a right to go, or a place where

---

4. This same claim is raised Hunt Martin's Point II.

the public is likely to come into contact with the nuisance. A nuisance is public when it affects rights to which every citizen is entitled such as traveling on a public street.

*Id.* (internal citations omitted). A nuisance may be found where the unreasonable use "obstructs the rights or property of the whole community, *or neighborhood, or of any considerable number of persons.*" *City of St. Louis v. Varahi, Inc.,* 39 S.W.3d 531, 535 (Mo.App.2001) (internal quotation marks omitted; emphasis added). A public nuisance that impinges upon a public right is not necessarily converted into a private nuisance because the nuisance disproportionately affects certain members of the community. *Id.* A public nuisance may be found where "the extent of the annoyance, injury or damage may be unequal, or may vary in its effect upon individuals." *Id.* (internal quotation marks omitted).

■■■ Greenwood asserted that the nuisance arose from the Quarry's unreasonable use of a public road. Greenwood presented testimony that the dust and noise of the trucks prevented residents and business people from fully enjoying their own property to the extent that they could not maintain a garden or a yard because of the dust, or leave their doors and windows open because of the dust and noise. Greenwood also presented evidence that residents did not feel it was safe for their children to ride their bikes on neighborhood streets or even stand at a bus stop. An engineer testified that the northbound lanes, the lanes that bear the load from the laden trucks going from the Quarry to the highway, were deteriorating from the constant heavy weight, and certain aspects of this deterioration created a safety issue for the traveling public.

From the evidence presented, the jury could conclude that the Appellant's unrea-

sonable use of the road interfered with a public right to full, free, and safe use of a public road and was, therefore, unreasonable. The testimony of the residents about the effect of the truck traffic on the properties near Second Avenue and the safety issues raised by an engineer's testimony was sufficient to establish that the Appellants' activity affected the community as a whole. Just because residents directly abutting the route were disproportionately affected does not necessarily render the public nuisance a private nuisance. Point denied.

Martin Marietta next asserts in Point VI that Greenwood failed to provide substantial evidence that the trucks created a substantial interference. Appellants argue that Greenwood failed to provide objective evidence, such as testing or monitoring of air quality, noise volumes, or emission levels. Appellants also contend that Greenwood failed to demonstrate that the trucks create a public safety problem because Greenwood could not show any vehicle accidents on Second Avenue caused by a Quarry truck.

■■■ Substantial evidence is evidence, "which if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 814 (Mo. banc 2003) (internal quotations and citations omitted).

■■■ Greenwood presented evidence that trucks travel the Second Avenue route at a rate of one every two minutes on average, between 6:30 a.m. until after 5:00 p.m. during the week. Truck traffic diminishes during the weekend but Quarry trucks still utilize the roads on those days. The road is narrow, so trucks must pull over to permit other trucks to pass, thereby impairing travel on the road. A city employee testified that the city receives

more complaints about Quarry trucks than any other issue. Residents and business owners who own property near the road testified that the dust and noise prevents them from enjoying their property or operating their businesses as they would wish. The jury could conclude from the evidence that the Appellants' use of Second Avenue was so extensive and of such duration as to constitute a substantial interference.

The jury heard evidence that the constant heavy use of Second Avenue has caused the road to fail. Notably, the northbound lanes have sustained significantly more damage than the southbound lanes, from which the jury could conclude that the road failure was due to the heavily laden trucks from the Quarry that use the northbound lanes and not from regular vehicular traffic. Greenwood provided further evidence that the abuse and ineffective repair of Second Avenue has resulted in significant safety issues for travelers who would otherwise use the road. Repeated overlays have led to dangerous drop offs along the edge of the narrow road and the road has developed swales and ruts that can cause vehicles to "bottom out" along certain stretches. The jury heard testimony that children could not ride their bikes near Second Avenue or even wait for a school bus near the street because of the danger posed by the high volume of heavy truck traffic. From this evidence, the jury could conclude that the Appellants' unreasonable use of the road substantially interfered with public safety.

Greenwood's failure to provide objective evidence such as emissions studies does not prevent the city from providing sufficient evidence of a substantial interference. The primary focus in a nuisance inquiry is whether the defendant's activities unreasonably interfered with the community's use and enjoyment of their land or a community asset, such as, here, a public road. *See Rychnovsky v. Cole,* 119 S.W.3d 204, 209–10 (Mo.App.2003). The citizens' testimony as to how the excessive dust, noise, and fumes interfere with the use and enjoyment of their property and the operation of their businesses is consistent with such an inquiry. Nor does the lack of evidence about vehicular accidents on Second Avenue necessarily imply that the road is safe. Rather, the jury could conclude from the evidence that the absence of accidents was more a result of the reduced speed limits and the reluctance of Greenwood residents to use the road.

Greenwood provided sufficient evidence to support an inference that the Appellants' use of Second Avenue was unreasonable and created a substantial interference such that the public's right to safety and to the community's right to use and enjoy their property had been substantially impaired. Point denied.

Martin Marietta and Hunt Martin [5] next argue that Greenwood failed to demonstrate that the truck drivers were agents of the Quarry, sufficient to establish the Appellants' responsibility for any nuisance created by the trucks. Appellants contend that Greenwood failed to show that the Quarry controlled or directed the work done by the trucks. Appellants argued that the truck drivers were independent contractors and that the Quarry could not be held responsible for their actions. The trial court concluded that Greenwood provided sufficient evidence of control to submit the question to the jury. Appellants requested and received, over Greenwood's

5. This claim is raised in Point V of Martin Marietta's brief and in Point II of Hunt Mar-

tin's brief.

objections, that a scope of agency instruction be submitted to the jury.

▮▮▮▮ Whether an individual is an agent or an independent contractor frequently turns on the issue of control. *See Maldonado v. Gateway Hotel Holdings, L.L.C.*, 154 S.W.3d 303, 308 (Mo.App.2003). Generally, where one person contracts with another, "exercising an independent calling to do a work for him, according to the contractor's own methods, and not subject to his control or orders except as to results to be obtained, the former is not liable for the wrongful acts of such contractor or his servants." *Long v. Moon*, 107 Mo. 334, 17 S.W. 810, 811 (1891) (internal citations and quotations omitted). In nuisance, the primary focus is on whether the defendants controlled the instrumentality of the nuisance. *Rosenfeld*, 28 S.W.3d at 452. Here, that focus would be on whether the Quarry controlled the trucks, or, more specifically, whether Greenwood provided sufficient evidence from which the jury could conclude that the Quarry controlled and directed the trucks such that, under these facts, the Quarry controlled the instrumentality of the nuisance.

Greenwood provided evidence that Appellants contract with Pavlich, a trucking firm, to haul their rock to the customers and that the rate the trucking company charge is reflected in the distance the trucks must travel. A Quarry employee testified that they repaired Second Avenue when their truckers complained, stating that the road "was affecting *our trucks* that *we hired* to haul the material out of the Quarry." (Emphasis added.) Greenwood provided evidence that the Quarry controlled when trucks could come into the Quarry, how much they could haul, and when the trucks could begin running in the morning and when they would stop running at the end of the day. A Quarry

employee admitted they could control which trucks did business with the Quarry, and if a truck driver acted improperly they could implement a "one strike rule." There was also testimony that at one time the Quarry employed a dispatcher, evidence from which the jury could conclude that Quarry would not need a dispatcher unless it sought to exercise some kind of control over the trucks. Even more importantly, the jury heard evidence that the Appellants took steps to keep Second Avenue open when the city first sought to restrict access by filing the initial lawsuit in federal court.

This court cannot conclude that the trial court erred in submitting the issue of agency, at Appellant's request, to the jury. Greenwood raised sufficient question of the Quarry's control over the trucks to submit the issue to the jury.

The holding here is consistent with the courts of other states that have addressed issues and fact patterns very similar to those raised in this case. This court notes that in these cases a public nuisance was found on facts substantially more favorable to the defendants.

In *Hall v. North Montgomery Materials*, No. 2060946, —— So.2d ——, 2008 WL 2410239 (Ala.Civ.App. June 13, 2008), the Alabama Court of Civil Appeals declared a proposed granite mine to be a public nuisance, concluding that "one inevitable and consequence of its operation will be defective and dangerous roads." *Id.* —— So.2d ——, at *18. The mine could be accessed by three different routes over which trucks, driven by independent truckers, would haul the proposed 450,000 tons of gravel per year. *Id.* —— So.2d ——, at *2. All access routes required trucks to travel through a residential area. *Id.* —— So.2d ——, at *1. The roads were paved country roads, or farm-to-market roads, twenty-one feet wide or less with little to no

shoulders. *Id.* —— So.2d ——, at *2. The court noted that the roads were not designed to carry heavy loads. *Id.* Under the proposed production level, the court noted that during an eight hour work day, sixty trucks would enter and leave the mine at a rate of one every five minutes. *Id.* The court concluded that "the evidence indicated that there would be a fundamental alteration in quantity and quality of traffic on the three roads" once the mine opened. *Id.* —— So.2d ——, at *12. The heavy use of these three roads would "endanger the motoring public and damage the roads." *Id.* —— So.2d ——, at *13. The court reasoned that "if, in its usual operation, a business routinely places oversized vehicles on a narrow road that impedes passing and unduly increases of accidents ... the business should be considered a nuisance." *Id.* —— So.2d ——, at *14. The court found that the mining operation was "a public nuisance by reason of the fact that one inevitable consequence of its operation will be defective and dangerous roads." *Id.* —— So.2d ——, at *18.

In *West v. National Mines Corp.*, 168 W.Va. 578, 285 S.E.2d 670 (1981), property owners whose property abutted a public road along which a independent contractors hauled coal between a mine and a processing facility brought suit contending the dust created by the trucks was a nuisance. *Id.* at 673. The trial court denied the property owner's motion for an injunction and dismissed the suit. *Id.* at 672. In reversing the trial court's judgment, the appellate court noted that the coal trucks carried between thirty and fifty tons per load and ran six days per week. *Id.* at 673. The court noted, additionally, that the production of coal had escalated in recent years, increasing the amount of truck traffic on the road. *Id.* The plaintiffs testified that the dust required them to live with their doors and windows closed

and that the dust interfered with their breathing and prevented them from raising a garden. *Id.* at 673. The circuit court held that the trucks were operated by independent contractors and that none of the mining company employees could be held liable "because the dust problem was created by their use of a *public* road." *Id.* at 674. The appellate court reversed the trial court's judgment. *Id.* at 679. The court found that "the use and enjoyment of a public roadway ... must be exercised in a reasonable manner and with due regard for the right adjoining property owners to the use and enjoyment of their property." *Id.* at 677. The court noted, further, that "[i]t is a well established principle of law that one who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve the creation of a public or private nuisance, is subject to liability for harm resulting to others from such nuisance." *Id.* (*citing Restatement (Second) of Torts* § 427 B (1965)). The court agreed with the plaintiff's argument that "a party cannot escape liability for a nuisance created by its operations by contracting with others to perform the objectionable segments of its operations." *Id.*

In the above cases, the courts found that potential damage to roads similar to Second Avenue and the dust created by trucks, similar to that created along Second Avenue, sufficient to find a nuisance created by quarry or mine truck traffic. The analysis of the facts and the application to nuisance are persuasive and consistent with the result found here.

The trial court did not err in submitting the nuisance issue to the jury. Point denied.

**B. Negligence**

Appellants raise several points of error challenging the admissibility of Green-

wood's negligence claim. However, the peculiar nature of the verdict director, submitted and requested by Appellants, raises a question as to whether any claimed error associated with negligence need be addressed.

Three counts were submitted to the jury and the jury returned a verdict for Greenwood on two counts, negligence and nuisance, finding in favor of the defendants on the trespass count. Negligence was submitted to the jury in Instruction 6 through Instruction 19. The damages instruction for negligence, Instruction 16, stated: "If you find in favor of plaintiff then you must award plaintiff such sum as you may find from the evidence to be the *reasonable cost of repair of any damage to Second Avenue.*" (Emphasis added.) Instruction 20 through Instruction 31 concerned Greenwood's nuisance claim. The damages instruction for nuisance, Instruction 29, was virtually identical to that of Instruction 16: "If you find in favor of the City of Greenwood, then you must award the City of Greenwood such sum as you may find from the evidence that will *fairly and justly compensate* The City of Greenwood *for the cost to repair Second Avenue.*" (Emphasis added.)

Plaintiffs requested that a damage instruction be included in the instructions for each count. Defendants expressed concern that Greenwood could sustain multiple recoveries under such a scheme. As the measure of compensatory damages was the same for all three counts, the jury could award Greenwood the cost to repair the road as many as three times. Defendants proposed verdict form B asked the jury to return a verdict on each count against each defendant. After the matrix of verdicts, the form had one line for damages: "We, the undersigned jurors, assess the damages of Plaintiff Greenwood at $ _____ (stating the amount, or, if

none, write the word 'none')." Greenwood proposed that if the inclusion of a damage instruction in each count resulted in multiple recoveries, the trial court could "solve it afterwards ... in amended evidence." When the trial court expressed reluctance to follow this procedure, Greenwood conceded, stating: "We'll give them what they want."

Given the nature of the damages pleaded and Appellant's verdict form, to be awarded the full measure of damages at trial, the cost to repair the road, Greenwood need only prevail on one count. Greenwood prevailed on negligence and nuisance and, in the single damages line, was awarded compensatory damages of $1.9 million. Martin Marietta and Hunt Martin appealed both nuisance and negligence.

On appeal, as at trial, Greenwood only needed to prevail on one count to receive the full measure of compensatory damages. This court has reviewed Appellants' claims as to nuisance and has determined that nuisance was both properly plead and properly submitted to the jury. Greenwood prevails on the nuisance count; this court need not address Appellants' challenge to the verdict on negligence because such an analysis would have no practical effect on the outcome. Accordingly, this court need not and will not address Martin Marietta's Points I, II, and III, and Hunt Martin's Point I, all challenging the submissibility of the negligence claim.

## C. Declaratory Judgment

In Point VII, Martin Marietta argues that the trial court's declaratory judgment in favor of Greenwood, finding the city's ordinance was valid and enforceable pursuant to Missouri, law was contrary to Missouri law because the ordinance closed every street in the city to through truck

traffic and prevented access to state highways.

The grant of a declaratory judgment is reviewed under the same standard as a court-tried case. *Andresen v. Bd. of Regents of Mo. W. State Coll.*, 58 S.W.3d 581, 585 (Mo.App.2001). This court will affirm the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Statutory interpretation is a question of law subject to *de novo* review. *Lindquist v. Mid America Orthopaedic Surgery, Inc.*, 224 S.W.3d 593, 594–95 (Mo. banc 2007).

Greenwood's Ordinance No.2007–02–01–02 added Section 397.065 to Greenwood City Code. The Sections provides that "[c]ommercial vehicles, except local trucks making deliveries to and from residents thereon of goods, wares, merchandise and household deliveries, including household moving trucks, shall only operate on routes designated as a "Commercial Use Route" pursuant to Section 395.070." Martin Marietta points out that Greenwood has not designated any city street as a Commercial Use Route.

Martin Marietta first argues that the ordinance is invalid under Missouri law. Martin Marietta argues that Sections 304.170 and 304.180[6] create a "10 mile rule" that permits trucks meeting the maximum length, width, height, and weight specifications to travel Missouri highways. Martin Marietta contends that the statutory language permits such trucks to operate on the "state highway system (defined at § 304.001(13)), *and within ten miles of these statutorily defined systems.*" Martin Marietta argues that Greenwood city streets lie within "the ten-mile operating area adjoining the state highway system as made available under section 304.170." Consequently, they contend, Greenwood cannot restrict access to streets within this ten-mile buffer because the city cannot limit access to the state highway system.

Martin Marietta does not provide any legal support for a "10 mile rule" allegedly created by Section 304.170. Indeed, the specific statutory language of Section 304.170.10 states that trucks meeting these specifications "*may* be operated at a distance *not to exceed* ten miles from the interstate system." This language does not create a ten mile buffer around the state highway systems in which municipalities lose the ability to regulate their streets,[7] but, rather, the statute limits the reach of the Section 304.170. Indeed, Section 304.120 expressly grants municipalities the authority to regulate and restrict access to its roads. Section 304.120.2(4) provides: "Municipalities, by ordinance, may: . . . Limit the use of certain designated streets and boulevards to passenger vehicles." This court declines to interpret Section 304.170 as creating "10 mile rule" that would limit Greenwood's ability to regulate access to its city streets in direct conflict with such authority accorded in Section 304.120.

Martin Marietta's next argues that "highway," as defined in Section 301 creates an "expansive statutory definition . . . [extending] the broad access to state highways granted by statute . . . all the

---

6. All statutory references are to RSMo Cum. Supp.2005 unless otherwise specified.

7. Taken to its logical conclusion, Martin Marietta's argument would vest control of all streets in a ten-mile buffer zone around the state highway system in a state agency rather than the cities through which the highways past.

way to a municipal alley." This chapter defines "highway" as "any public thoroughfare for vehicles, including state roads, county roads, and public streets, avenues, boulevards, parkways or alleys in any municipality" Section 301.010(19). However, the term "highway" as defined in Section 301.010 is used "in its popular rather than its technical sense and is synonymous with 'road,' which is an open way of public passage for vehicles, persons, and animals." *Covert v. Fisher*, 151 S.W.3d 70, 74 (Mo.App.2004) (internal citations and quotations omitted). Consistent with this interpretation, this definition of highway, or road, does not implicate any statutory intent to provide unlimited access through city streets to a state highway.

■ Martin Marietta next argues that while Section 304.120.2(4) permits municipalities to regulate the use of streets, the statute does not permit the wholesale closing of city streets to through traffic. Inexplicably, Martin Marietta argues that to limit access to passenger vehicles does not authorize the city to prohibit through trucks. However, to only allow access to a certain population necessarily means that other populations are prohibited. If the Section 304.120.2(4) permits the city to limit access to passenger vehicles, the statute, by logical extension, equally permits Greenwood to prohibit through trucks or limit such trucks to designated routes.

This interpretation is consistent with the holding in *City of Richmond Heights v. Shackelford*, 446 S.W.2d 179 (Mo.App. 1969), in which the court held that Section 304.120.2(4) grants "authority ... to ban all commercial vehicles on these streets.... The city has full power to forbid all vehicles but it chooses to exercise only part of this power." *Id.* at 181. Martin Marietta argues that *Richmond Heights* is inapplicable because, in that case, the city "left other access to state

highways open." But, as Greenwood points out, the Greenwood ordinance did not foreclose all state highway access. Indeed, that other access route for Quarry trucks was unaffected by the ordinance, as was highway access for trucks using State Highways RA and BB. This access, however, did not proceed through Greenwood streets, but rather accessed Highway 291 south of Greenwood. As Greenwood points out, the ordinance did not prevent Quarry trucks from accessing the state highway system, just foreclosed the most profitable route.

■ Martin Marietta next argues that the ordinance is unconstitutional, in violation of article IV, section 29 of the Missouri Constitution, which grants authority to regulate access to and from state highway to the highways and transportation commission. Martin Marietta notes that State Highway 150 passes through Greenwood and is denominated Main Street as it does so. Martin Marietta contends that the ordinance limited access from State Highway 150 to State Highways RA and BB. As noted above, however, the ordinance did not foreclose all access as Highway 291 provides access these three highways and, therefore, does not implicate article IV, section 29 and the powers granted the state highways and transportation commission.

The trial court did not err in finding that Ordinance No.2007–02–01–02 valid and enforceable under Missouri law. Point denied.

## D. Compulsory Counterclaim

In Point VIII, Martin Marietta asserts that Greenwood's tort claims were compulsory counterclaims to their federal action and could not be brought separately in state court. Appellants filed the federal action in August of 2006, alleging breach of contract and violations of the Commerce

Clause and challenged the city's right to close the street to through trucks under both federal and state theories. Appellants argue that the torts claims arose from the same transaction as the federal action and, therefore, should have been brought as compulsory counterclaims.

A counterclaim is compulsory if the claim both exists at the time of service and "arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a)(1)(A). The Eight Circuit has identified varying tests to determine whether a claim is compulsory:

(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(2) Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

(4) Is there any logical relation between the claim and the counterclaim?

*Cochrane v. Iowa Beef Processors, Inc.,* 596 F.2d 254, 264 (8th Cir.1979) (*quoting Wright & Miller,* Federal Practice and Procedure § 1419 at 42) (internal footnotes omitted). Appellants contend that the "logical relationship test" is applicable here in that both actions implicate the same questions of fact.

■■■ Appellants' federal action, however, involved the interpretation of a contract and questions of federal law related to the Commerce Clause. The tort claims brought in state court do not relate to the same questions of law or fact, do not implicate the same evidence, and would not be barred by *res judicata* by resolution of the federal action. The identity of the parties and the Quarry's practice of dispatching trucks through Greenwood are the only

logical relationships between the two actions.

Even were these logical relationships sufficiently controlling here, it does not follow that the separate claims logically belong together. Appellants attempted to remove the instant action to federal court but the federal court remanded the question of whether the ordinance violated state law, the best proposition of logical overlap sustainable by the Appellants. Appellants now attempt to assert a more attenuated connection between a state law question not related to the ordinance and the federal action. This court concludes that the question of whether the Quarry's practice of dispatching trucks through Greenwood or whether the Quarry's repair and use of Second Avenue constituted negligence and nuisance are not logically related to the breach of contract and Commerce Clause claims. The nuisance and negligence claims did not arise out of the same transaction or occurrence such that they could only be brought as compulsory counterclaims in the federal action. Point denied.

### E. Punitive Damages

In Point IX, Martin Marietta contends that Greenwood's petition failed to state a claim for punitive damages. Martin Marietta contends that Greenwood failed to plead punitive damages because the city only asked for punitive damages in the prayer and did not aver any facts that demonstrated "a complete indifference to or conscious disregard for the safety of others."

■■■ Where the appellant contends that the petition fails to state a claim upon which relief can be granted, this court reviews the petition "in almost an academic manner." *Nazeri v. Mo. Valley Coll.,* 860 S.W.2d 303, 306 (Mo. banc 1993). "A motion to dismiss for failure to state a

cause of action is solely a test of the adequacy of the plaintiff's petition. It assumes that all of plaintiff's averments are true, and liberally grants to plaintiff all reasonable inferences therefrom. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive." *Id.* (citation omitted).

 Punitive damages must be both plead and proved. *Benson v. Jim Maddox Nw. Imports, Inc.,* 728 S.W.2d 668, 669 (Mo.App.1987). The request for punitive damages need not be plead in a separate count, *Brown v. Payne,* 264 S.W.2d 341, 345 (Mo.1954), but "it must nevertheless appear from the complaint, either by direct averment or from necessary inference, that the act occasioning the damages was done maliciously or was the result of the willful misconduct of the defendant or of that reckless indifference to the rights of others which is equivalent to an intentional violation of them, at least where the wrongful act does not in itself imply malice." *Bower v. Hog Builders, Inc.,* 461 S.W.2d 784, 798 (Mo.1970) (internal quotation marks omitted). Legal malice is not actual malice, but rather, the act was done intentionally and without just cause or excuse. *Id.* To state a claim for punitive damages, the pleadings must "allege facts indicating the defendant maliciously, willfully, intentionally, or recklessly injured the plaintiff by his tortious act." *Dyer v. Gen. Am. Life Ins. Co.,* 541 S.W.2d 702, 706 (Mo.App.1976).

 Greenwood's petition asked for punitive damages and asserted that the Quarry sent a "high volume of truck traffic" through city streets. The city asserted that such use was unreasonable in that the "truck traffic annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights of property of the whole community." The petition states that Greenwood passed the ordinance be-

cause the city had a "genuine concern for the safety of homeowners, children, and pedestrians" but that the defendants filed suit in federal court seeking to enjoin that ordinance and keep Second Avenue open for trucks. The petition stated further, that the defendants made repairs to Second Avenue without obtaining permits or approval, that the repairs were defective and unsafe, that the damage from such repairs were foreseeable, that the defendants continued to utilize the unsafe repairs, and that the defendants refused to pay for the damage to the road.

Liberally granting Greenwood all favorable inferences from its pleading, the petition provided sufficient facts to demonstrate that the wrongful acts complained of were done intentionally, purposefully, or recklessly. These facts, "coupled with the allegation that such entitled plaintiffs to punitive damages, fairly informed defendant of the nature of the demand although it would have been preferable to have been more specific." *Bower,* 461 S.W.2d at 798. "It was not necessary [under these circumstances] to plead that the acts were done with malice or maliciously since those words are equivalent in definition to wrongful acts intentionally done without just cause or excuse." *Id.* at 798–99. Point denied.

 Martin Marietta next contends that Greenwood failed to make a submissible case for punitive damages, arguing that Greenwood failed to demonstrate that the Appellants acted with an "evil mind." "Whether there is sufficient evidence for an award of punitive damages is a question of law." *Perkins v. Dean Mach. Co.,* 132 S.W.3d 295, 299 (Mo.App.2004). This court reviews the record in a light most favorable to submissibility to determine whether, as a matter of law, the evidence was sufficient to submit the claim for punitive damages. *Id.* "A submissible case is

made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity-that is, that it was highly probable-that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Id.* (internal quotation marks omitted). Whether or not an award of punitive damages is appropriate depends on the facts of a particular case but may be found where the facts demonstrate that the defendants engaged in a "willful or continual perpetration of tortious activity." *State ex rel. Dresser Indus., Inc. v. Ruddy*, 592 S.W.2d 789, 793 (Mo. banc 1980).

▆▆▆▆ As the analysis of submissibility was limited to the nuisance claim, this court will likewise limits its analysis of the submissibility of punitive damages to the nuisance allegations. "To recover punitive damages in a nuisance action, a plaintiff must show that the defendant knowingly and willfully maintained the nuisance." *Vermillion v. Pioneer Gun Club*, 918 S.W.2d 827, 833 (Mo.App.1996). Punitive damages are recoverable where the plaintiff shows by clear and convincing evidence that the defendant engaged in " 'a wrongful act intentionally without just cause or excuse.' " *Ruppel v. Ralston Purina Co.*, 423 S.W.2d 752, 757 (Mo.1968) (*quoting MAI* 16.01).

▆▆▆ Greenwood presented evidence that the excessive truck traffic not only interfered with the residents' ability to enjoy their property because of dust, fumes, and noise, but created a safety issue, not only for vehicular traffic on Second Avenue, given the failed state of the road and the dangers posed by the repeated defective repairs, but also for children living along the route. Greenwood presented evidence that the road was not designed or intended for that level of heavy traffic, and despite the inadequate nature of the road and the road's failure, the Quarry continued to dispatch a heavy volume of trucks up the route.

Moreover, the evidence demonstrated that the Appellants were aware of the citizen complaints and problems with the road but had not taken any steps, beyond repairing the road, and then only when their truckers complained, to abate the nuisance. Citizens complained of the dust, noise, and fumes as well as the condition of the road. William Gahan, the Midwest Division President of Martin Marietta, testified by deposition that he did not take any steps to address the "concerns that citizens of Greenwood raised concerning truck traffic." Darrell Carlyle, the Greenwood city administrator, testified that citizens complained about truck traffic more than any other issue. He testified that he had called the Quarry regarding the truck traffic issues but that the Quarry had never returned his phone calls. Despite the complaints, the Quarry acted to ensure the road would remain open to trucks. A Quarry representative testified that the Quarry lost $2 million in profits when it could not run its trucks through Greenwood.

From the evidence, the jury could have concluded that the Appellants knew that their practice of dispatching trucks through Greenwood was causing Second Avenue to degrade, and that the Appellants knew that the high volume of truck traffic created a substantial interference with the rights of Greenwood citizens to enjoy their property and safely use the roads, but, nevertheless, continued to direct truck traffic through the town because that was the most profitable route. The evidence was sufficient to support Greenwood's claim that the Appellants willfully, intentionally, and knowingly maintained a nuisance with reckless disregard for the safety of Greenwood residents, both those

that lived along the route and those who were forced to use a failed road.

Appellants do not contest the measure of damages but rather limit their claims to the sufficiency of the pleading and the submissibility of punitive damages. Accordingly, this court finds that Greenwood plead and proved punitive damages sufficient to sustain the submission of such damages. The trial court did not err in denying Appellants' motions for directed verdict and judgment notwithstanding the verdict. Point denied.

### F. Post–Judgment Interest

In Point XI, Margin Marietta contends that the trial court applied the wrong post-judgment interest rate. By statute, the post-judgment interest rate is five percentage points above the Federal Funds Rate on the date the judgment is entered. Section 408.040.02. On June 16, 2008, the date the judgment was entered, the Federal Funds Rate was two percent. Accordingly, Martin Marietta argues, the applicable post-judgment interest rate was seven percent. The trial court assigned a nine percent interest rate in violation of Section 408.040. Greenwood concedes this point and agrees that the applicable interest rate was seven percent.

The judgment is remanded to the trial court for calculation and entry of post-judgment interest at seven percent.

### IV. CONCLUSION

This court finds that the trial court did not err in denying Appellant's motions for directed verdict and judgment notwithstanding the verdict as Greenwood sufficiently plead and proved nuisance and punitive damages. Further, the trial court's declaratory judgment that the ordinance was valid and enforceable under Missouri law was not error. Greenwood's tort claims were not compulsory counterclaims in Appellants' federal action.

The judgment is affirmed in all aspects except as to that portion dealing with post-judgment interest. The case is remanded to the trial court for calculation of judgment on post-judgment interest and entry of the amount of post-judgment interest as directed by this opinion.

All Concur.